IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Scott E. Smith and Eva Denise Smith, | ) | Civil Action No. 6:25cv14047 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Taverik Capital, LLC, *f/k/a* WCM Global | ) | **COMPLAINT** |
| Wealth, LLC; Magnolia Asset Services, LLC; | ) | **(Jury Trial Demanded)** |
| Erik C. Weir; James A. Blair, III; SC Strategic | ) | |
| Opportunity Fund II, LLC; Point Farm | ) | |
| Investors, LLC; ECW Investing, LLC; Edisto | ) | |
| River Investors, LLC; WCM Main Street, | ) | |
| LLC; and Reedy River Falls, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiffs Scott E. Smith ("Dr. Smith") and Eva Denise Smith ("Mrs. Smith" or "Dr. Smith's Wife"), bring this Complaint against Defendants Taverik Capital, LLC, formerly known as WCM Global Wealth, LLC, Magnolia Asset Services, LLC, Erik C. Weir, James A. Blair, III, SC Strategic Opportunity Fund II, LLC, Point Farm Investors, LLC, ECW Investing, LLC, Edisto River Investors, LLC, and Reedy River Falls, LLC and allege as follows:

**INTRODUCTION**

1.     This action arises from a calculated scheme of deception, self-dealing, and fiduciary breaches perpetrated by Defendant, a purported financial advisor who Plaintiffs entrusted with the hard-earned fruits of Dr. Smith's work as a psychologist and Mrs. Smith's work as a realtor— approximately $4 million of their life savings—intended to secure their retirement.

2.     Plaintiffs, a married couple in their mid-to-late sixties with no corporate pensions, relied on Defendants' representations of expertise and integrity, including Weir's claims of being a "best-selling author" and a premier wealth manager.

1

3.      Plaintiffs expressly instructed Defendants to safeguard their assets while ensuring reasonable growth. They made clear that these funds represented decades of hard work and sacrifice and were intended to provide financial security during retirement.

4.      Instead, Weir liquidated Plaintiffs' existing, diversified securities portfolio and funneled their money into a series of high-risk, illiquid alternative investments—many of which were controlled by Weir through a web of LLCs—without assessing Plaintiffs' risk tolerance, financial goals, or retirement needs.

5.      These investments included distressed real estate ventures and opaque entities falsely portrayed as safe and lucrative opportunities. Defendants concealed material risks, misrepresented the nature of the investments, and failed to disclose his personal financial interests in these ventures.

6.      While Plaintiffs desired growth, they did not knowingly consent to an overly aggressive investment strategy that prioritized outsized gains at the expense of principal protection. Defendants' decision to place Plaintiffs in such a high-risk portfolio directly contradicted these instructions and exposed them to catastrophic losses.

7.      When Plaintiffs began to question the failure to achieve reasonable returns, losses in their account, and lack of transparency, Defendants engaged in a pattern of evasive conduct: withholding information, failing to update electronic platforms, and continuing to solicit additional funds while prior investments were collapsing.

8.      Ultimately, Plaintiffs discovered catastrophic losses in the investments Weir pushed on Plaintiffs well exceeding $2,000,000.

9.     Defendants' response was dismissive and arrogant, stating, "at least you have some money left," and offering no plan to remedy the harm. After Plaintiffs took steps to protect remaining assets, Defendants abandoned all communication.

10.     Weir, WCM Global Wealth, LLC (n/k/a Taverik Capital, LLC), Magnolia Asset Services, LLC (together with WCM Global Wealth, referred to as "WCM Global"), and Weir's network of associates and companies used inter-related entities to raise new money to fund failing ventures under different names.

11.     Weir and his cadre unlawfully used investor assets to fund their lavish lifestyles— including private aircraft—and to build their personal brands and fame. The investors, meanwhile, lost substantial sums of their hard-earned money at the hands of an investment adviser who assured them that he was knowledgeable, competent, and trustworthy.

12.     Upon information and belief, WCM Global and the other corporate defendants have managed to keep their financial heads above water by fraudulently raising new capital through a complex scheme of intercompany relationships and transfers. But the scheme is now unraveling as Defendants have recently suspended payments in several funds, and Plaintiffs must act now to protect their rights, safeguard their hard-earned assets, and remove themselves from Defendants' fraudulent empire.

## PARTIES

13.     Plaintiff Scott E. Smith is a citizen and resident of Maryland.

14.     Plaintiff Eva Denise Smith is Scott Smith's wife and is also a citizen and resident of Maryland.

15.     Upon information and belief, Weir split the business originally registered as WCM Global Wealth, LLC into two entities: (1) Taverik Capital, LLC, which is a continuation of the

WCM Global Wealth corporate entity, and (2) Magnolia Asset Services, LLC. Even though they are now separate entities, they together perform the functions previously performed by WCM Global Wealth, LLC, and under the same ownership and leadership as WCM Global Wealth, LLC.

16.    Each therefore is the successor in interest to WCM Global Wealth, LLC. Because this split occurred after Plaintiffs made their investments through Weir and WCM Global Wealth, Plaintiffs refer to these entities together as WCM Global.

17.    Defendant Taverik Capital, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina, and is in the business of providing money management and investment advisory services.

18.    Taverik Capital is a Registered Investment Adviser registered with the United States Securities and Exchange Commission ("SEC"). Prior to becoming Taverik Capital, WCM Global Wealth, LLC was a Registered Investment Adviser registered with the SEC.

19.    Upon information and belief, neither WCM Global Wealth, LLC nor Taverik Capital have been registered as an investment adviser in the state of Maryland.

20.    Upon information and belief, at no time have WCM Global Wealth, LLC nor Taverik Capital been qualified to do business in the state of Maryland.

21.    Upon further information and belief, WCM Global Wealth LLC, in its own name and then as Taverik Capital, served as the "Investment Manager" for Defendant SC Strategic Opportunity Fund II, LLC ("SCSOF II").

22. Magnolia Asset Services, LLC is a limited liability company organized and existing under the laws of the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina.

23. Upon information and belief, Magnolia Asset Services provides management and other services for various investments at issue in this case which WCM Global Wealth, LLC used to provide.

24. Upon information and belief, Weir is the sole principal of Magnolia Asset Services.

25. Upon information and belief, Blair serves as the general counsel for Magnolia Asset Services.

26. Weir is a citizen and resident of Greenville County, South Carolina.

27. Upon information and belief, Weir is the sole and managing member of WCM Global.

28. Upon further information and belief, Weir holds, or represented himself to hold, several securities licenses, including Series 7, 4, 24, 63, and 65.

29. Upon information and belief, Weir was never registered as an investment adviser or as a broker in Maryland.

30. Weir was a Certified Financial Planner ("CFP") and thus was subject to the Certified Financial Planner Board's ("CFP Board") Code of Ethics and Standards of Conduct during the course of conduct described herein.

31. The CFP Board's code of ethics provides that a CFP must (a) act with honesty, integrity, competence, and diligence; (b) act in the client's best interest; (c) exercise due care; (d) avoid or disclose and manage conflicts of interest; (d) maintain the confidentiality of and protect

the privacy of client information; and (e) act in a manner that reflects positively on the financial planning profession and CFP certification.

32.     The CFP Board's standard of conduct provides that CFPs owe the following fiduciary duties to their clients and potential clients: (a) duty of loyalty; (b) duty of care; and (c) duty to follow client instructions.

33.     In order to become a CFP, Weir agreed to be bound by the CFP's code of ethics and standard of conduct.

34.     Upon information and belief, Weir continued to hold himself out as a CFP while providing services to Plaintiffs despite no longer being recognized as such by the CFP Board. He therefore remained subject to the CFB Board's Code of Ethics and fiduciary standards.

35.     Weir and the other named Defendants architected a financial scheme to ensnare Plaintiffs and other investors so Defendants could enrich themselves from the investors' hard-earned money.

36.     Upon information and belief, Weir with the intent to deceive while cunningly trying to hide his true intent, has developed layer after layer of entities owned and/or controlled by him and to shift money between them for the purpose of enriching himself and shielding assets from creditors and those he has defrauded.

37.     Upon information and belief, Weir owns, controls, and/or manages, and at all relevant times owned, controlled, and/or managed, either directly or indirectly, WCM Global; WCM Camperdown, LLC; Crypto Venture 1, LLC; SC Strategic Opportunity Fund II, LLC; Point Farm Investors, LLC; ECW Investing, LLC; Edisto River Investors, LLC; WCM Main Street, LLC; and Reedy River Falls, LLC.

38.     Upon information and belief, Weir gave himself a 30% ownership interest in the Crypto Venture 1, and at all times relevant hereto, served as the President of Crypto Venture.

39.     Upon further information and belief, Weir gave himself a 20% ownership interest in the WCM Camperdown, and at all times relevant hereto, served as the President of WCM Camperdown.

40.     Upon information and belief, James A. Blair, III, is a citizen and resident of Berkeley County, South Carolina. Upon further information and belief, Blair presently, and at all relevant times, served as WCM Global's General Counsel through WCM Global's offices in Greenville County, South Carolina.

41.     South Carolina Strategic Opportunity Fund II, LLC, ("SCSOF II") is a limited liability company organized and existing pursuant to the laws of the State of Delaware, is qualified to do business in the state of South Carolina, and at all times relevant hereto, maintained its principal place of business in Greenville County, South Carolina.

42.     Reedy River Falls, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina.

43.     Upon information and belief, Reedy River Falls serves as the managing member of the SCSOF II. At all relevant times, Weir was the sole managing member of Reedy Falls.

44.     Point Farm Investors, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina.

45.     Upon information and belief, Point Farm Investors owns, or owned, property in Charleston County, South Carolina and is, or was, the record owner of several parcels of land located on Wadmalaw Island, South Carolina, identified by TMS Nos.: TMS No. 1330000057 (9.71 acres), 1330000087 (16.44 acres), 1340000033 (22.11 acres, 1340000008 (72.00 acres), 1340000029 (5.70 acres), 1340000045 (4.52 acres), 1340000046 (4.77 acres), 1340000009 (137.59 acres), 1340000002 (3.18 acres), 1340000040 (2.64 acres), 1340000039 (1.98 acres), 1340000041 (2.16 acres), 1340000010 (173.15 acres), and 1350000001 (1408.77 acres).

46.     Upon information and belief, Edisto River Investors, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina.

47.     Upon further information and belief, Edisto River Investors was organized for the purpose of pursuing a real estate investment on Wadmalaw Island in Charleston County, South Carolina.

48.     Upon further information and belief, Edisto River Investors serves as the managing member of Point Farm Investors. At all relevant times, Weir was the sole managing member of Edisto River Investors.

49.     Upon information and belief, ECW Investing, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina. At all relevant times, Weir was the sole managing member of ECW Investing.

8

50.     Upon information and belief, WCM Main Street, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which is qualified to do business in the State of South Carolina, maintains and at all times relative hereto maintained its principal place of business in Greenville County, South Carolina. At all relevant times, Weir served as the President of WCM Main Street.

51.     In this complaint, SC Strategic Opportunity Fund II, LLC, Point Farm Investors, LLC, ECW Investing, LLC, Edisto River Investors, LLC, WCM Main Street, LLC, and Reedy River Falls, LLC are referred to as the "Fund Defendants."

52.     At all times relevant to this case, Weir and Blair were an agent, principal, president, representative, manager, member, servant, and/or employee of WCM Global, the Fund Defendants, WCM Camperdown, and ECW Investing.

53.     Blair was instrumental in aiding and abetting Weir, WCM Global, and the Fund Defendants to carry out the fraudulent, deceptive, and unlawful schemes alleged in this complaint by, among others, creating, sanctioning, and publicly affirming the validity of documents and the validity, safety, security, and trustworthiness of Fund Defendants' corporate structure and relationships which are at the heart of these schemes.

54.     All Weir and Blair's actions, inactions, omissions, and wrongdoings were performed for and on behalf of WCM Global and/or the Fund Defendants in the course and scope of their agency and/or employment with WCM Global and the Fund Defendants.

55.     Therefore, in addition to their own actions, inactions, and omissions, WCM Global and the Fund Defendants are individually, jointly, severally, and totally liable for the mismanagement, misconduct, wrongdoing, actions and/or omissions of Weir and Blair's under agency law and common law principles of *respondeat superior*.

## JURISDICTION AND VENUE

56.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of Maryland, and Defendants are citizens of different states.

57.    The Court has general personal jurisdiction over Defendants WCM Global, Weir, and Blair because WCM Global maintains its principal place of business in Greenville, South Carolina, Weir is a resident of South Carolina, and Blair is a resident of South Carolina.

58.    The Court has general personal jurisdiction over the Fund Defendants because each maintains its principal place of business in Greenville, South Carolina.

59.    Alternatively, the Court has general personal jurisdiction over the Fund Defendants because each engages in continuous and systematic activities within the State of South Carolina, including the use of the courts of this State to enforce contractual and other rights against citizens of South Carolina. Defendants presently conduct business and, at all relevant times, conducted business and performed acts in South Carolina giving rise to this complaint. Defendants therefore have sufficient contacts and business within South Carolina to be subject to the *in personam* jurisdiction of this Court.

60.    Alternatively, the Court has specific jurisdiction over the Fund Defendants because each conducted and performed specific acts that are the subject of this Complaint in South Carolina.

61.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and D.S.C. Local Rule 3.01(A) because some Defendants reside and/or are located in this division, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this division.

## FACTUAL BACKGROUND

**Weir's Solicitation of Plaintiffs' Life Savings to Prop Up His Failing Entities**

62.    Plaintiffs are a married couple, ages 66 and 67, residing in Annapolis, Maryland.

63.    Plaintiffs collectively entrusted approximately $4 million of their life savings to Defendants for prudent investment and retirement planning.

64.    In or about August 2022, Plaintiffs' prior financial advisor, Andrew Jaeger, introduced them to Weir. Jaeger was retiring and represented Weir as a premier wealth manager capable of taking Plaintiffs "to the next level."

65.    In order to gain their business, Weir orchestrated a polished recruitment: he flew Plaintiffs to Greenville, South Carolina, lodged them in a hotel, presented meetings in his upscale office, and introduced a staff of five suit-clad "professionals," all to convey stability, scale, and fiduciary rigor.

66.    Defendants knew that Plaintiffs were inexperienced investors in the type of investments that he was creating and selling, and that Plaintiffs were relying on Defendants to fulfill their fiduciary responsibilities.

67.    At that meeting, Weir gave Plaintiffs an autographed copy of his book and presented pre-packaged investment allocations—primarily illiquid alternative investments—without performing any meaningful assessment of Plaintiffs' risk tolerance, time horizon, liquidity needs, or retirement objectives.

68.    Weir held himself out as an expert fiduciary, "best-selling" financial author, and being so successful that he has a private jet.

69.    Weir intended to induce, and did in fact induce, Plaintiffs to place full confidence in him and his recommendations.

70.     Plaintiffs expressly instructed Defendants that the paramount objective was to protect and grow their retirement assets to ensure a secure and timely retirement.

71.     Weir, understanding the need to earn Plaintiffs' trust and confidence, represented that he would act as a fiduciary, safeguard Plaintiffs' funds, and invest prudently.

72.     But in reality, Weir had pre-selected a series of high-risk, illiquid alternative investments—many of which were tied to Defendant's own LLCs and personal interests—without assessing Plaintiffs' risk tolerance, financial goals, or retirement needs.

73.     Acting as Plaintiffs' fiduciary, Weir promptly liquidated Plaintiffs' diversified securities portfolio and diverted millions into high-risk, illiquid ventures that—on information and belief—served Weir's personal and financial interests, and not Plaintiffs' interests.

74.     Weir's recommendations placed Plaintiffs' portfolio into highly correlated assets (alternative funds and LLCs tied to the same underlying real-estate projects), thereby eliminating diversification and magnifying Plaintiffs' exposure to a narrow, distressed sector.

75.     Weir used DocuSign and similar electronic methods to push closing documents for swift signature, frequently after oral descriptions that differed materially from the written terms, including undisclosed extensions, accrual instead of payment of "guaranteed" interest, and nested LLC structures that obscured the true investment and ownership.

76.     Weir's conflicts of interest were pervasive: he recommended projects local to his community and, on information and belief, in which he held equity or management roles, creating a potent incentive to steer Plaintiffs' money into ventures that benefited him, rather than Plaintiffs.

77.     These investments were not only unsuitable for Plaintiffs' age and retirement objectives but also served Defendants personal interests, including propping up failing projects in which he held equity and control.

**Weir Invested Plaintiffs' Funds into Promissory Notes Given to Weir's Companies Which Stopped Paying Interest and Breached the Notes.**

78.     Via five separate promissory notes, Plaintiffs loaned $1,500,000 to the Fund Defendants as follows:

| Date | Amount | Fund Defendant |
|---|---|---|
| October 2, 2022 | $350,000 | SCSOF II |
| October 2, 2022 | $400,000 | Point Farm Investors |
| December 31, 2022 | $250,000 | Point Farm Investors |
| December 14, 2022 | $250,000 | ECW Investing |
| December 31, 2022 | $250,000 | WCM Main Street |

79.     As is relevant here, each note contains the following terms:

a.     Each debtor "unconditionally promises to pay quarterly Ordinary Interest installments based on the outstanding principal balance of the Note (the 'Quarterly Installment')."

b.     "The Quarterly Installment payments shall continue every three-month period thereafter on the same day of the third month continuing to the Maturity Date."

c.     Each debtor represented and warrantied "as of the date hereof and at all times thereafter prior to Maturity Date or earlier payment in full of the Company's obligations hereunder" that "the execution, delivery and performance by the Company of this Note does not, and will not: (i) violate any law, governmental rule or regulation, court order or agreement to which it is subject or by which its properties are bound[,] or the corporate organizational or governing documents of the Company."

d.     An "Event of Default" includes "the failure of the Company to pay when due any installment of the Note Amount, Interest (if applicable) or any other amount due under this Note, within thirty (30) days after the applicable due date."

e.      An "Event of Default" includes when "any representation or warranty made by the Company to the Lender in connection with this Note shall prove to have been false in any material respect when made."

f.      An "Event of Default" includes if "the Company shall be unable to pay, or shall admit in writing its inability to pay, its debts generally as they become due."

g.      The debtor may accelerate the total amount, including all outstanding principal and interest, "upon the occurrence of an Event of Default."

h.      And the debtor will pay to lender "all reasonable costs and expenses incurred by the Lender in the enforcement or collection of any of the Company's material obligations under this Note, including, without limitation, reasonable attorneys' fees and expenses, in any trial, arbitration, or administrative proceeding, or in connection with any bankruptcy, insolvency or appeal."

80.     Defendants were the sole and exclusive drafters of the notes.

81.     Defendants told Plaintiffs that Plaintiffs would, unconditionally and without exception, timely receive the Quarterly Installment payment each quarter.

82.     Moreover, when soliciting the promissory notes each Defendant knew but failed to disclose to Plaintiffs that:

a.      Plaintiffs' and other promissory notes were by and between related entities, and funds were being transferred between entities shortly after deposit;

b.      Plaintiffs' and other promissory notes represented additional rounds of debt that were made necessary when the preceding rounds of debt were non-performing and were eventually reclassified as preferred equity on the company books and records;

c.      None of Plaintiffs' promissory notes were backed by any collateral of any kind; and

14

d.   Plaintiffs' promissory notes represented payments into non-performing assets with little to no real prospect of repayment.

83.   Additional facts regarding the execution of, delivery of, and failure to perform under each of Defendant's notes, and the ability of each Defendant to pay its debts generally as they become due are below.

*The SCSOF II Note*

84.   Plaintiffs invested $350,000 in SCSOF II pursuant to a promissory note dated October 2, 2022, which promised an 8% annual interest rate, quarterly payments of $7,000, and a stated maturity date of October 31, 2025, with options for three one-year extensions.

85.   Weir and WCM Global represented SCSOF II as a diversified real estate opportunity fund suitable for Plaintiffs' retirement objectives, but failed to disclose material facts about its financial condition, risk profile, and interrelationships with other Weir-controlled entities.

86.   Weir and WCM Global aggressively promoted SCSOF II through slick advertising, videos, and verbal assurances, while concealing that the investment was high-risk, illiquid, and unsuitable given Plaintiffs' age, retirement goals, and risk tolerance.

87.   Weir and WCM Global failed to disclose that SCSOF II's primary asset was the CAP River campus in downtown Greenville—a 97,000 sq. ft. office building (formerly Bowater), a multi-story parking deck, and a vacant parcel—an asset class that had suffered severe post-COVID market deterioration and faced near-total financing constraints.

88.   SCSOF II was a 50/50 joint venture partner with WCM Main Street, LLC in the CAP River, Camperdown, and Bowater projects, creating correlated exposure and eliminating diversification.

89.     Upon information and belief, SCSOF II's development of the Camperdown Development and Bowater Campus in downtown Greenville—the entity's primary purpose—was already subject to $12,000,000.00 in existing promissory notes owed to other SCSOF II lenders, in addition to $19,000,000.00 in bank debt, when Plaintiffs executed their promissory note for SCSOF II.

90.     Upon further information and belief, interest was not being paid timely on the existing debt to the existing promissory note holders at the time because SCSOF II was not financially able to pay interest on the notes. Instead, interest was accruing on the existing notes and the indebtedness was mounting.

91.     To "cure" the fact that SCSOF II was unable to service its debt, SCSOF II devised a scheme to recapitalize itself.

92.     Through the recapitalization, the existing promissory notes would be reclassified as preferred equity, thus eliminating the interest carry and the pressure of pending due dates, and new money would be raised through the issuance of a new round of promissory notes.

93.     SCSOF II then sought new loans—the carry for which they likewise knew or should have known they would be unable to service—which was done to mask the true financial condition of the entity from Plaintiffs.

94.     Defendants did not disclose these facts to Plaintiffs.

95.     Plaintiffs' notes have not paid interest timely. In addition, on September 22, 2023, SCSOF II sent an "Investor Update" to investors providing an update regarding the status of the investments and the plan for the future.

96.     The "Investor Update" provides that "all current investor note payments and any preferred interest payments will be accrued and not paid quarterly" and that repayment would

occur only from closing proceeds after a future sale, confirming that the Fund could not meet its contractual obligations.

97.    On May 4, 2023, Weir sent Plaintiffs a memorandum acknowledging "multiple bank failures, monetary tightening, record inflation, and the fastest interest rate increases in history", admitting that "there is limited to no financing available for office and retail space," and warning that the sale could result in "very poor investment performance, if not a near total loss."

98.    On February 13, 2025, SCSOF II sent a letter to Plaintiffs stating that it was making a payment of $43,120.00 for accrued interest, sourced from the sale of the CAP River property, and that final principal payments would follow.

99.    On February 27, 2025, SCSOF II sent a follow-up letter confirming that the CAP River campus had been sold and that "there were insufficient proceeds for any equity member distributions" and that "no further payments are expected" beyond a pro-rata principal payment of $39,860.10, leaving Plaintiffs with a substantial loss.

100.    Plaintiffs' investment in SCSOF II was unsuitable given their age, retirement objectives, and risk tolerance, and Defendant's failure to disclose material facts deprived Plaintiffs of the ability to make an informed decision.

*WCM Main Street, LLC Note*

101.    Plaintiffs invested $250,000 in WCM Main Street, LLC pursuant to a promissory note dated December 31, 2022, which promised an 8% annual interest rate and quarterly payments of $5,000, with a stated maturity date of December 31, 2025, with options for three one-year extensions.

102.   Defendant represented WCM Main Street as a legitimate, standalone investment opportunity intended to provide stable returns and diversification, but failed to disclose its true purpose and affiliations

103.   Defendant further represented WCM Main Street as a safe, income-producing investment, but concealed that its viability depended on the success of SCSOF II and related entities, which were undercapitalized and insolvent.

104.   WCM Main Street was not an independent investment vehicle; it was a Weir-controlled entity financially intertwined with SCSOF II and other distressed ventures, including the troubled Camperdown Project.

105.   Plaintiffs invested funds in WCM Main Street based on Defendant's representations that it was a legitimate, standalone investment opportunity designed to provide stable returns and diversification.

106.   On information and belief, WCM Main Street served as a conduit for inter-company transfers and self-dealing, designed to prop up failing projects and protect Defendant's personal interests, rather than to advance Plaintiffs' stated investment objectives.

107.   Defendants failed to disclose that WCM Main Street was part of a network of affiliated entities—including ECW Investing and SCSOF II—that operated without regard to corporate formalities and engaged in commingling of funds.

108.   On information and belief, WCM Main Street did not generate independent revenue sufficient to meet its obligations to investors and relied on new investor funds to sustain operations, a hallmark of a fraudulent scheme.

109. Plaintiffs were never provided full accounting records, proof of WCM Main Street's solvency, or documentation showing how their funds were applied, despite repeated requests.

110. In February 2025, WCM Main Street admitted in a letter to noteholders that a partial repayment of the notes was funded by the sale of the CAP River property, which consisted of multiple parcels in downtown Greenville and was jointly owned by WCM Main Street and SCSOF II. WCM Main Street acknowledged that the sale proceeds were insufficient to fully repay principal, resulting in only an approximate 85% repayment of note balances. In other words, WCM Main Street admitted that it would not honor its agreement.

111. Defendant's letter further confirmed that WCM Main Street and SCSOF II were 50/50 joint venture partners in the CAP River entities, directly tying Plaintiffs' investment to the same distressed real estate ventures that caused prior losses.

112. By misrepresenting WCM Main Street as a legitimate, independent investment and concealing its ties to SCSOF II and other failing projects, Defendant engaged in fraudulent inducement, breach of fiduciary duty, and deceptive trade practices.

113. Plaintiffs' investment in WCM Main Street was unsuitable given their age, retirement objectives, and risk tolerance, and Defendant's failure to disclose WCM Main Street's true nature and affiliations deprived Plaintiffs of the ability to make an informed decision.

*Point Farm Investors, LLC Notes*

114. Plaintiffs invested a total of $650,000 in Point Farm pursuant to two promissory notes.

115. The first promissory note, dated October 2, 2022, was for $400,000, which promised an 8% annual interest rate and quarterly payments of $8,000, with a stated maturity date

of October 31, 2025, with options for three one-year extensions.

116.     The second promissory note, dated December 31, 2022, was for $250,000, which promised an 8% annual interest rate and quarterly payments of $5,000, with a stated maturity date of December 31, 2025, with options for three one-year extensions.

117.     Defendants represented to Plaintiffs that Point Farm owned approximately 2,000 acres of undeveloped land on Wadmalaw Island, South Carolina, and that the property was being monetized through saltwater mitigation credits and conservation easements.

118.     These representations were materially false and misleading.

119.     Upon information and belief, at the time of these statements, the property was subject to significant litigation concerning saltwater mitigation rights and was not generating any cash flow from mitigation credits or conservation easements.

120.     Defendants failed to disclose that Point Farm was financially distressed and had no realistic ability to generate revenue sufficient to meet its obligations or repay investor funds.

121.     Defendants further failed to disclose that Point Farm had previously borrowed substantial sums from related entities created by Weir and funded by other clients, including AV Real Estate Fund and Edisto River Investors, and had defaulted on those obligations.

122.     Upon information and belief, AV Real Estate Fund extended multiple loans and lines of credit to Point Farm between 2017 and 2022, including:

a.     A loan in April 2017 at 12% interest, which matured in April 2022 and remains unpaid;

b.     A line of credit initially capped at $591,667, later increased to $646,935, which was fully drawn and never repaid; and

c.     An additional loan of $500,000 in May 2022, despite prior defaults.

123.    These loans were repeatedly extended rather than enforced, and interest was accrued only for accounting purposes, even though Defendants knew Point Farm had no ability to repay.

124.    Defendants did not disclose to Plaintiffs that Point Farm's ability to meet its obligations depended entirely on raising new money from new investors under promissory notes—a hallmark of a fraud.

125.    After making only two quarterly interest payments, Defendants suspended quarterly payments and purported to "accrue" them, despite the notes' unconditional quarterly payment obligations.

126.    Upon information and belief, Point Farm is unable to pay its debts generally as they become due.

127.    On August 26, 2025, Plaintiffs emailed Defendants stating quarterly payments were in default and requesting a ledger of paid vs. accrued interest for each note; Defendants did not provide a compliant accounting and thereafter issued an extension notice.

128.    On October 10, 2025, just prior to the first note's maturity, Edisto River Investors, LLC, as Point Farm's manager, sent a "Promissory Note Extension Notice" unilaterally extending the $400,000 Note maturity from October 31, 2025, to October 31, 2026, and stating that "the quarterly installments shall continue to accrue each quarter until the new Maturity Date."

129.    Upon information and belief, Point Farm has not paid interest or principal on its obligations and remains insolvent, rendering Plaintiffs' investment effectively worthless and Point Farm in breach of the note.

130.    Under the Event of Default clause in both notes, "the failure of the Company to pay when due any installment . . . or any other amount due under this Note, within thirty (30) days

21

after the applicable date due" constitutes an Event of Default; accrual of interest does not cure or replace the required quarterly payment obligation.

131.    Point Farm failed to pay multiple quarterly installments within thirty (30) days of their due dates after Q2 2023, triggering Events of Default and Plaintiffs' rights to accelerate and pursue remedies.

132.    Defendants' misrepresentations and omissions regarding Point Farm's financial condition, litigation risks, and inability to repay constitute fraud, breach of fiduciary duty, and deceptive trade practices.

133.    Plaintiffs' investment in Point Farm was unsuitable given their age, retirement objectives, and risk tolerance, and Defendant's failure to disclose material facts deprived Plaintiffs of the ability to make an informed decision.

*ECW Investing, LLC Note*

134.    Plaintiffs invested $250,000 in ECW Investing, LLC pursuant to a promissory note dated December 14, 2022, which promised an 8% annual interest rate and quarterly payments of $5,000, with a stated maturity date of December 31, 2025, and options for three one-year extensions.

135.    Defendants represented ECW Investing as a legitimate, standalone investment opportunity, but failed to disclose its true purpose and affiliations.

136.    ECW Investing was not an independent investment vehicle, but rather a personal investment entity controlled by Weir, used to channel funds into ventures tied to SCSOF II and other Weir-controlled projects.

137.    The promissory note explicitly states that the loan proceeds were for "personal investing by Erik C. Weir, individually" and were not intended to be used for any investment on behalf of the lender, nor managed by WCM Global Wealth, LLC.

138.    This language contradicts Defendant's prior representations that ECW was part of a structured investment strategy aligned with Plaintiffs' retirement objectives.

139.    Defendants failed to disclose that ECW Investing was financially intertwined with SCSOF II and WCM Main Street, entities involved in the troubled Camperdown Project and other distressed ventures.

140.    On information and belief, ECW Investing served as a vehicle for inter-company loans and self-dealing, designed to prop up failing projects and protect Defendant's personal interests.

141.    Defendant did not inform Plaintiffs that ECW Investing had mortgages and liens on Camperdown Project parcels, securing purported loans that were either not funded or funded under circumstances suggesting fraudulent conveyances.

142.    These liens gave ECW—and by extension, Weir and the other Defendants— priority over unsecured investors, including Plaintiffs, in direct conflict with Defendants' fiduciary obligations.

143.    Weir and ECW Investing failed to disclose that ECW Investing's ability to perform under the promissory note depended on raising new investor funds, a hallmark of fraud. ECW's financial viability was not based on independent revenue generation but on continuous inflows from new lenders.

144.    Upon information and belief, ECW Investing is unable to pay its debts generally as they become due.

145.    Defendants represented that quarterly interest payments would be made, and while Plaintiffs received some payments, these payments do not negate the underlying misrepresentation of ECW Investing's purpose and risk profile.

146.    Plaintiffs were never provided full accounting records, proof of ECW Investing's solvency, or documentation showing how loan proceeds were applied.

147.    Defendants failed to disclose that ECW Investing was part of a network of affiliated entities, including SCSOF II and WCM Main Street, which were undercapitalized, insolvent, and engaged in inter-company transfers to mask financial distress.

148.    These relationships were material to Plaintiffs' decision to invest and were intentionally concealed.

149.    By misrepresenting ECW Investing as a safe, independent investment and concealing its ties to failing projects and conflicted transactions, Defendants engaged in fraudulent inducement, breach of fiduciary duty, and deceptive trade practices.

150.    Plaintiffs' investment in ECW Investing was unsuitable given their age, retirement objectives, and risk tolerance, and Defendants' failure to disclose ECW's true nature and affiliations deprived Plaintiffs of the ability to make an informed decision.

**Weir Further Invested Plaintiffs' Funds into Equity Interests in His Companies**

151.    Plaintiffs were further duped into $600,000 of "equity investments" in Weir's various funds which would further line Weir's pockets and result in tremendous losses to Plaintiffs:

| **Date** | **Amount** | **Fund Defendant** |
|---|---|---|
| October 2, 2022 | $500,000 | WCM Camperdown |
| October 2, 2022 | $100,000 | Crypto Venture 1 |

*WCM Camperdown, LLC*

152.    Plaintiffs invested $500,000 in WCM Camperdown, LLC pursuant to a "Membership Interest Subscription Agreement for Class B Units," dated October 2, 2022, for Class B units representing approximately 0.56% ownership, based on a $90M capitalization target.

153.    Weir and WCM Global represented that the investment was tied to the Camperdown mixed-use development in downtown Greenville and was a safe, income-producing opportunity suitable for Plaintiffs' retirement objectives.

154.    These representations were materially false and misleading for reasons set forth below.

155.    Upon information and belief, WCM Camperdown's capital stack included multiple layers of debt and liens, with cash-flow insufficiency that made the project dependent on new investor money to meet interest and operating obligations—contrary to Weir's assurances of safety and suitability for retirement cash-flow needs.

156.    WCM Camperdown was also financially intertwined with other Weir-controlled vehicles, thereby eliminating diversification and magnifying correlated real-estate risk across Plaintiffs' portfolio.

157.    For example, contemporaneous materials and later correspondence confirm Weir-affiliated real-estate entities held venture stakes across Downtown Greenville assets—evidence of cross-entity entanglement and correlated exposure in the Weir platform.

158.    Weir and WCM Global did not provide Plaintiffs with audited financial statements, tenant-by-tenant rent rolls, or granular cash-flow projections commensurate with the project's leverage and refinancing risk.

159.    Upon information and belief, in late 2022 and throughout 2023, the WCM Camperdown and SCSOF II joint venture was unable to refinance construction loans for the Camperdown campus in Greenville, South Carolina.

160.    Upon information and belief, the last remaining asset, the Greenville News Building, was sold in Q2 2024, but proceeds were insufficient to repay investors.

161.    Upon information and belief, when refinancing failed, Magnetar (the preferred mezzanine lender) acquired the senior secured debt from Trez Capital (f/k/a Trez Forman) and took control of collateralized campus interests, materially impairing Camperdown's membership value.

162.    On or about May 8, 2025, Plaintiffs received a final distribution of $50,335.85, representing a near-total loss of principal. Weir confirmed no further payments would be made.

163.    Plaintiffs' investment in WCM Camperdown was unsuitable given their age, retirement objectives, and risk tolerance, and Weir and WCM Global's failure to disclose WCM Camperdown's true nature and affiliations deprived Plaintiffs of the ability to make an informed decision.

*Crypto Venture 1, LLC*

164.    Plaintiffs invested $100,000 in Crypto Venture 1, LLC ("CV1") pursuant to a Membership Interest Subscription Agreement and Joinder to Operating Agreement dated October 2, 2022, which provided Plaintiffs with Class B Units representing a 10% financial interest and 14.29% voting rights in the company.

165.    Weir and WCM Global presented CV1 as a structured, professionally managed investment into digital assets, offering diversification and long-term potential while downplaying

volatility, regulatory risk, and illiquidity endemic to crypto strategies for retirement-aged investors.

166.    Weir and WCM Global assured Plaintiffs that Crypto Venture 1 was professionally managed and risk-controlled, suitable for retirement objectives, and that the entity's activities would be limited to the crypto/digital asset domain with transparent accounting and periodic reporting.

167.    Weir and WCM Global failed to properly disclose that CV1's principal strategy would be to invest in or rely upon Crypterns, LLC, a New York entity providing "crypto education," rather than directly acquiring diversified, custody-controlled digital assets.

168.    Upon information and belief, CV1 lacked a viable revenue model and generated no independent income, and investor funds were channeled to other Weir-controlled entities or used for unrelated purposes, rather than for bona fide crypto education or investment mandates.

169.    Weir and WCM Global circulated a letter in February 2024 stating that Crypterns, LLC had ceased business and filed a Certificate of Dissolution in New York, that no distributions were likely forthcoming,

170.    Weir admitted that Plaintiffs had "pretty much lost everything," yet offered no remedial plan and provided no fulsome accounting of CV1 funds.

171.    The structure and execution of CV1—its reliance on a single, failing external venture (Crypterns), absence of audited reporting, and lack of custody or diversification—rendered the investment unsuitable for Plaintiffs' stated objectives of capital preservation, transparency, and liquidity.

172.    Plaintiffs' investment in CV1 was unsuitable given their age, retirement objectives, and risk tolerance, and Weir and WCM Global's failure to disclose CV1's true nature and affiliations deprived Plaintiffs of the ability to make an informed decision.

*     *     *

173.    Weir also solicited funds for SC Hangar 1, LLC and Washington Development, LLC funds, both presented as attractive opportunities for Plaintiffs.

174.    After Plaintiffs uncovered their losses elsewhere, Weir grudgingly returned approximately $350,000 in these newer placements only after persistent demands.

175.    On information and belief, Weir continues to solicit funds for SC Hangar 1, LLC through Magnolia Asset Services.

**Weir Ghosts Plaintiffs When They Call Weir Out on His Wrongdoing**

176.    From late 2023 onward, Weir's quarterly summaries ceased, his professional staff departed, and Plaintiffs experienced difficulty obtaining information about balances, distributions, and investment performance.

177.    Weir failed to update electronic platforms and custodial records (including Adepar, Midland Trust, Inspira, and related systems), thereby misrepresenting the apparent "stability" or value of Plaintiffs' holdings and masking losses for extended periods.

178.    In October 2023, Plaintiffs' household faced a medical crisis. Mrs. Smith suffered a severe eye injury requiring eight surgeries at Johns Hopkins Wilmer Eye Institute.

179.    Weir knew of Mrs. Smith's condition and, on information and belief, exploited Plaintiffs' distraction by further reducing communication and transparency.

180.    In April 2025, as medical issues stabilized, Plaintiffs resumed active review and found that portfolio values appeared static without growth. Plaintiffs demanded a comprehensive in-person review in Greenville.

181.    On or about May 4, 2025, Plaintiffs traveled at their own expense to Weir's office, which appeared in disarray and unprofessional condition, with the original staff gone and replaced by very junior assistants.

182.    At that meeting, Weir disclosed—for the first time—that in three of five alternative investments Plaintiffs had "pretty much lost everything." He referenced Camperdown, SCSOF II, and the "crypto" investment, and then dismissively remarked, "at least it wasn't fatal; you have some money left."

183.    Weir offered no coherent remedial plan, no accounting of where Plaintiffs' funds had gone, no documentation for the crypto "education" spend, and no apology for the catastrophic losses sustained.

184.    In the days surrounding the May 2025 meeting, Plaintiffs observed sudden changes to electronic platforms that belatedly reflected large losses in their investments—suggesting that updates were made only because Plaintiffs insisted on an in-person review.

185.    Shortly after the May meeting, Plaintiffs learned that Weir began changing entity names and operating through newly minted or rebranded LLCs—transitioning from WCM Global Wealth to Taverik Capital, and subsequently referencing yet a third company, Magnolia Asset Services, LLC.

186.    On information and belief, these successor entities were used to evade responsibility, confuse clients and custodians, and obscure asset control and fee flows connected to Plaintiffs' investments.

187.    In response to their mounting concerns, Plaintiffs delinked Weir from their Schwab accounts to protect their remaining securities. Weir reacted with hostility, failed to attend a scheduled virtual meeting, and thereafter ghosted Plaintiffs, ceasing meaningful communication.

188.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial financial damages, including lost principal and growth opportunity, as well as fees, expenses, and out-of-pocket costs associated with attempting to recover their assets.

189.    Plaintiffs have further suffered emotional distress, anxiety, and loss of sleep, and have been forced to continue working beyond planned retirement due to the depletion and endangerment of their retirement savings.

190.    Plaintiffs reserve the right to name additional defendants upon discovery of additional entities or persons who participated in, aided, or abetted the scheme alleged herein.

**<u>FOR A FIRST CAUSE OF ACTION</u>**
**(Breach of Fiduciary Duty – Weir and WCM Global)**

191.    The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

192.    At all times relevant hereto, Weir and WCM Global owed Plaintiffs fiduciary duties in the investment of their money, including the duty of care, the duty to be guided in their investment recommendation by the principle that they were to do what was in the best interests of the Plaintiffs, and to refrain from self-dealing transactions.

193.    Weir and WCM Global breached their fiduciary duties to Plaintiffs in several particulars, including, but not limited to, one or more of the following:

a.    Engaging in self-dealing by creating an investment scheme wherein they sought to enrich themselves over their clients;

30

b.    Failing to disclose Defendants' material financial interests in the investments they recommended, including ownership stakes, management fees, and related-party transactions that created undisclosed conflicts of interest;

c.    Recommending that Plaintiffs invest money into entities via various instruments when Weir and WCM Global knew or should have known, but failed to disclose to Plaintiffs, that the financial condition of the entities to which loans and equity investments were made was so precarious that the likelihood of repayment or any return on the investment was unlikely or remote;

d.    Recommending that Plaintiffs invest money into entities in which Weir and WCM Global had a direct financial interest and by failing to disclose the extent of Defendants' interest in these entities;

e.    Recommending that Plaintiffs invest money into entities which Weir and WCM Global knew, but failed to disclose to Plaintiffs, that the entities lacked the ability to pay their debts timely in the ordinary course of business;

f.    Acting at all times in a conflict of interest by recommending investments to Plaintiffs, the true but undisclosed purpose of which was to advance and protect the interests of Defendants rather than Plaintiffs;

g.    Failing to adequately assess the recommended investments suitability;

h.    Recommending inappropriate investments given Plaintiffs stated investment goals, risk tolerance, and risk capacity;

i.    Recommending a nearly 2:1 ratio of alternative investments to traditional investments;

j.      Advising Plaintiffs to invest their hard-earned money across various alternative funds under the guise of diversification, Defendants recommended funds that were, in reality, highly correlated and exposed to the same underlying speculative projects; and

k.      In such other particulars as the evidence in the case may demonstrate.

194.    As a direct and proximate result of the conduct of Weir and WCM Global, Plaintiffs have suffered, and continue to suffer, significant damages. Not only have Plaintiffs lost the opportunity to realize the gains and growth that they should have realized from an appropriate and unconflicted management of their funds, but they have also invested millions of dollars into investments that lack any value as the lion's share of Plaintiffs' investments went directly to Weir and WCM Global as purported management fees.

195.    Plaintiffs therefore are entitled to (1) actual damages, including the disgorgement of fees charged in violation of Weir and WCM Global's fiduciary obligations, (2) consequential damages, (3) well managed account damages, (4) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, (5) costs, (6) prejudgment interest, and (7) such other relief as is just, equitable and proper.

## FOR A SECOND CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty – Blair)**

196.    At all times relevant hereto, Defendant Blair was an experienced attorney authorized to practice law in South Carolina and therefore had knowledge of the fiduciary duties owed to WCM Global clients.

197.    At all times relevant hereto, Blair was aware of the fiduciary duties owed to the Plaintiffs by Weir and WCM Global, and he knowingly aided and abetted Weir and WCM Global in the breach of such duties in several particulars, including but not limited to the following:

a.     Aiding with the creation of layer after layer of entities owned and/or controlled by Defendants WCM Global and Weir to enable them to shift money between those entities for the purpose of enriching themselves and shielding assets from creditors and those they have defrauded.

b.     Preparing, reviewing, and/or disseminating marketing materials and memoranda that they knew contained false and/or misleading information;

c.     Enabling Weir and WCM Global to conceal material information from Plaintiffs, solicit Plaintiffs' investments under false pretenses and for improper purposes, and use Plaintiffs' funds to enrich themselves;

d.     Lending credibility to Weir and WCM Global's fraudulent scheme; and

e.     In such other particulars described in this complaint and as discovery may show.

198.    As a direct and proximate result of the Blair's conduct, Plaintiffs have suffered damages and continue to suffer damages. Not only have the Plaintiffs lost the opportunity to realize the gains and growth that they should have realized from an appropriate and unconflicted management of their funds, but they have also invested millions of dollars into promissory notes that lack any value as the makers of the notes have no financial wherewithal to repay the notes.

199.    Plaintiffs therefore are entitled to (1) actual damages, (2) consequential damages, (3) well managed account damages, (4) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, (5) costs, (6) prejudgment interest, and (7) such other relief as is just, equitable and proper.

### FOR A THIRD CAUSE OF ACTION
**(Fraud/Constructive Fraud – Weir, WCM Global, and Fund Defendants)**

200.    The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

201.    These Defendants had an obligation to truthfully disclose all material information within their possession regarding the subject matter of this complaint because they either solicited, received, or managed Plaintiffs' life savings or the entities in which Plaintiffs invested.

202.    Plaintiffs had the absolute right to rely upon the truthfulness, accuracy, and completeness of what was told to them by these Defendants.

203.    Weir and WCM Global made representations to Plaintiffs that were false and/or misleading, in several particulars, including but not limited to the following:

a.    Representing that Weir and WCM Global would act in accordance with their fiduciary duties when they had no intention of action as such;

b.    Representing that Plaintiffs' hard-earned money was best invested in illiquid and risky alternative assets;

c.    Representing that Plaintiffs would earn higher returns by investing their money in the Funds and Equity Investments;

d.    Assuring Plaintiffs that the Funds Defendants were safe investments for Plaintiffs;

e.    Misrepresenting the true nature and extent of their financial interest in the investments that they recommended;

f.    Misrepresenting the true financial status of the Fund Defendants;

g.    Misrepresenting that Plaintiffs were diversifying their investments;

h.    Representing that Weir holds securities licenses;

i.    Representing that Weir and WCM Global are properly registered to provide investment advisory services; and

j.    In such other particulars as the evidence in the case may demonstrate.

204.     The misrepresentations that Weir and WCM Global made to Plaintiffs were material to the Plaintiff's decision to invest in the Fund Defendants.

205.     Weir and WCM Global knew that their misrepresentations were false and/or misleading at the time the representations were made.

206.     Weir and WCM Global made these misrepresentations with the intent that Plaintiffs rely upon them and be induced to invest in the Fund Defendants.

207.     Plaintiffs did not know, and did not have any reason to know, that Weir and WCM Global's misrepresentations were false.

208.     Weir, WCM Global, and the Fund Defendants likewise failed to provide information to the Plaintiffs about their investments which were necessary in order to make the information provided complete and accurate. In doing so, these Defendants concealed the true nature and extent of their financial interest in the investments that they recommended, the true financial status of the Fund Defendants prior to soliciting Plaintiffs' funds and taking their money, and the illiquid and risky nature of these investments.

209.     These Defendants' omissions include, but are limited to, the following:

a.     Failing to disclose Defendants' material financial interests in the investments they recommended, including ownership stakes, management fees, and related-party transactions that created undisclosed conflicts of interest;

b.     Failing to disclose to Plaintiffs the fact that many of the funds cross invested in other funds that had nothing to do with the assets in which Plaintiffs believed they were investing;

c.     Failing to disclose all material facts relating to these promissory notes and their issuers, including the issuers' financial condition and ability to repay the debt and interest;

d.     Otherwise failing to disclose the true financial condition of the companies which Defendants were propping up with Plaintiffs' money;

e.     Failing to disclose the true business purpose and nature of assets of the companies which Defendants were propping up with Plaintiffs' money;

f.     Providing promissory notes, subscription agreements, proposals, financial statements, and other related documents for the purpose of soliciting investments from Plaintiffs and others knowing that the information disclosed publicly did not reflect the true relationship by and between related entities and/or the true financial condition of the entities into which investments would be made;

g.     Failing to provide complete audited financial statements and making false representations that such statements were provided to all investors;

h.     In failing to disclose the fact that the tenants in the Camperdown project had leases that were substantially below market rates; and

i.     In such other particulars as the evidence in the case may demonstrate.

210.    These Defendants selectively chose which information to provide Plaintiffs so that Plaintiffs could not make an informed decision.

211.    These Defendants' omissions were material.

212.    These Defendants' omissions were relied upon by Plaintiffs in making the decision to invest in the recommended promissory notes.

36

213. These Defendants' omissions were made or omitted for the purpose of inducing Plaintiffs to act in reliance upon their truthfulness and accuracy.

214. As a direct and proximate consequence of these Defendants' fraudulent and deceitful conduct, Plaintiffs have incurred significant financial damages. Not only have Plaintiffs lost the opportunity to realize the gains and growth that they should have realized from an appropriate and unconflicted management of their funds, but they have also invested millions of dollars into promissory notes and equity investments that lack any value as those entities have no financial wherewithal to repay the notes or generate revenue to repay investors.

215. Plaintiffs are therefore entitled to (1) actual and well managed account damages, (2) direct damages, (3) incidental damages, (4) consequential damages, (5) punitive damages, and (6) such other relief as is just, equitable, and proper.

### FOR A FOURTH CAUSE OF ACTION
**(Violation of the South Carolina Uniform Securities Act of 2005,
S.C. Code Ann. §§ 35-1-101 to -880 – All Defendants)**

216. The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

217. As set forth in more detail in this complaint, Defendants defrauded Plaintiffs in several particulars, including but not limited to the following:

a. Recommending and advising that Plaintiffs invest in over-leveraged entities with little ability to repay investors without continuing to raise capital from new investors, including new investors duped and lured into these investments which in many cases were repackaged under different names to conceal their true nature;

b.      Raising money from Plaintiffs to fund companies which Defendants knew, but failed to disclose, have little to no likelihood of satisfying their obligations or returning Plaintiffs' investment;

c.      Failing to disclose to Plaintiffs the fact that many of the funds cross invested in other funds that had nothing to do with the assets in which the investor believed they were investing;

d.      Recommending and implementing an investment scheme that falsely advised Plaintiffs that their investments aligned with their investment objectives;

e.      Recommending and placing Plaintiffs' money in investments which met none of, and were counter to, their objectives;

f.      Recommending and implementing an investment scheme that falsely advised Plaintiffs that the promissory notes aligned with his investment objectives of tax conscious to avoid any adverse tax consequences, provided tax efficient income, were balanced in risk allocation, and provided for moderate growth and income for retirement expenses, and preserved a healthy level of liquidity;

g.      Failing to disclose all material facts relating to these investments and their issuers;

h.      Failing to disclose the true financial condition of the companies Defendants were propping up with Plaintiffs' money;

i.      Failing to disclose the true business purpose and nature of assets of the companies Defendants were propping up with Plaintiffs' money;

j.      Failing to provide complete audited financial statements and making false representations that such statements were provided to all investors;

38

k.      Helping prepare the subscription agreements, proposals, financial statements, and other related documents for the purpose of soliciting investments from Plaintiffs and others knowing that the information disclosed publicly did not reflect the true relationship by and between related entities and/or the true financial condition of the entities into which investments would be made;

l.      Providing investment advisory services without being appropriately registered;

m.      Misrepresenting that Weir holds securities licenses; and

n.      In such other particulars as the evidence in the case may demonstrate.

218.   The actions of these Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509, and the regulations regulating conduct established thereunder.

219.   Plaintiffs therefore are entitled to (1) actual damages, (2) costs, (3) attorneys' fees, (4) prejudgment interest, (5) rescission, and (6) such other relief as is just, equitable and proper.

### FOR A FIFTH CAUSE OF ACTION
#### (Violation of the Maryland Securities Act, Md. Code Ann. § 11-101, *et seq.* – Weir and WCM Global)

220.   The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

221.   Weir and WCM Global were obligated to but failed to register as an investment adviser in the State of Maryland during the relevant time.

222.   Defendants Weir and WCM Global, engaged in wrongful and fraudulent conduct in violation of the Maryland Securities Act, Md. Code Ann. § 11-401, -405, and the regulations regulating conduct established thereunder, for the same reasons described in the Fourth Cause of Action above.

223.     Weir and WCM Global therefore violated the Maryland Securities Act, and the regulations regulating conduct established thereunder.

224.     Plaintiffs therefore are entitled to (1) actual and well managed account damages, (2) rescission, (3) any other statutory damages, (4) costs, (5) attorneys' fees, (6) prejudgment interest, and (7) such other relief as is just, equitable and proper.

**FOR A SIXTH CAUSE OF ACTION**
**(Violation of the South Carolina Unfair Trade Practices Act,**
**S.C. Code Ann. §§ 39-5-10 to -180 – Weir, Blair, and WCM Global)**

225.     The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

226.     At all times relevant hereto, these Defendants were engaged in commerce in the State of South Carolina.

227.     Defendants engaged in an unfair method of competition and/or an unfair or deceptive act or practice in the conduct of trade or commerce.

228.     Defendants' unfair or deceptive acts and practices included:

a.     Taking on funds owed to Plaintiffs and others that each Defendant knew or should have known that it could not repay;

b.     Falsely representing that Plaintiffs' funds would be carefully and prudently invested;

c.     Creating a scheme whereby the only way Defendants could pay existing investors, even just in part, was by taking in money from new investors;

d.     Building and concealing a complex web of interrelated companies for the purpose of facilitating and shielding the movement of money from one failing entity to another knowing that new money would be paid ostensibly into one entity and

utilized for the purpose of propping up another and funding Defendants' extravagance, all to the detriment of those deceived into funding these activities, including Plaintiffs;

e.    Touting and representing as legitimate a corporate construct that Defendants knew or should have known had insufficient income and capital to pay their expenses and interest on their debts and was therefore doomed to fail; and

f.    Such other particulars and unfair methods of competition, unfair or deceptive acts, and unfair or deceptive practices that discovery may reveal and the evidence in the case may demonstrate.

229.    The unfair and deceptive acts and practices committed by Defendants in the conduct of their trade and commerce have a potential for repetitive impact on the public interest, and in fact have been repeated.

230.    Such unfair and deceptive acts and practices constitute a violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 to -180.

231.    Defendants' unfair and deceptive acts and practices described above constituted willful, intentional, and knowing violations of the Unfair Trade Practices Act.

232.    As a result of the conduct of these Defendants, Plaintiffs have suffered damages and continue to suffer damages. Not only have Plaintiffs lost the opportunity to realize the gains and growth that they should have realized from an appropriate and unconflicted management of their funds, but they have also invested millions of dollars into promissory notes that lack any value as the makers of the notes have no financial wherewithal to repay the notes.

233.    To the extent any Defendant contends that this claim is barred in whole or in part by the regulated activity exemption, this claim is pled in the alternative to Plaintiffs' Securities

Act claims in the event the Securities Acts are found to not to apply to Defendants' conduct. This claim also involves additional conduct than Plaintiffs' Securities Acts claims.

234.     Plaintiffs therefore are entitled to (1) actual damages, (2) treble damages, (3) costs, (4) attorneys' fees, (5) prejudgment interest, and (6) such other relief as is just, equitable, and proper.

## FOR A SEVENTH CAUSE OF ACTION
### (Violation of the Maryland Consumer Protection Act, Md. Code Ann. §§ 13-301, *et seq.* – Weir, Blair, and WCM Global)

235.     The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

236.     These Defendants engaged in unfair and deceptive conduct as described in the Sixth Cause of Action.

237.     Defendants' actions were deceptive in that they were capable of being interpreted in a misleading manner.

238.     Defendants' actions were unfair in that they fell within existing concepts of unfairness that society has established through law or otherwise and were immoral, unethical, oppressive, or unscrupulous.

239.     Defendants' actions violated Md. Code Ann. § 13-301.

240.     Defendants' actions were done in the course of trade or commerce.

241.     Defendants' actions caused Plaintiffs to suffer a loss of money in an amount to be determined through discovery and proven at trial.

242.     To the extent any Defendant contends that this claim is barred in whole or in part by any regulated activity exemption, this claim is pled in the alternative to Plaintiffs' Securities

Act claims in the event the Securities Acts are found to not to apply to Defendants' conduct. This claim also involves additional conduct than Plaintiffs' Securities Acts claims.

243.    Plaintiffs therefore are entitled to (1) actual and well managed account damages, (2) treble damages, (3) costs, (4) attorneys' fees, (5) prejudgment interest, and (6) such other relief as is just, equitable, and proper.

## FOR AN EIGHTH CAUSE OF ACTION
### (Civil Conspiracy – All Defendants)

244.    The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

245.    Without conceding that any entity lacks separate existence for purposes of this claim, Plaintiffs allege that Defendants Weir, WCM Global, and Blair, in concert with the Fund Defendants, conspired and agreed to steer Plaintiffs, and those similarly situated to Plaintiffs, into various alternative funds modeled to appear diversified, but which were actually highly correlated or tied to the same speculative projects.

246.    The purpose of this coordinated scheme was twofold: first, generate excessive management fees and performance-based income for the conspirators; and second, to funnel investor capital into funds in which Weir, Blair, and/or the Fund Defendants held direct or indirect equity interests or other contingent compensation, thereby personally benefiting from cash inflows and propping up failing ventures, all at Plaintiffs' expense.

247.    To the extent any Defendant contends that the intra-corporate conspiracy doctrine applies to bar any part of this claim, Plaintiffs plead in the alternative and invoke the personal-stake exception, because Defendants Weir and Blair acted in their own self-interest and for personal gain—through equity interests, performance allocations, fee participations, and other

contingent compensation—placing their conduct outside the scope of any agency or employment and rendering it adverse to Plaintiffs and divergent from any legitimate corporate purpose.

248.     The conspiratorial conduct amounted to an unlawful act or a lawful act by unlawful means, namely breach of fiduciary duty, violations of suitability standards, and fraudulent conduct as described in this complaint. The primary objective of the conspiracy was to enrich the conspirators and not to benefit Plaintiffs, thereby injuring Plaintiffs' financial interests

249.     As a direct and proximate result of the conduct of the Defendants, Plaintiffs have suffered damages and continue to suffer damages. Not only have Plaintiffs lost the opportunity to realize the gains and growth that they should have realized from an appropriate and unconflicted management of their funds, but they have also invested millions of dollars into promissory notes and other speculative investments that lack any value as the makers of the notes have no financial wherewithal to repay the notes.

250.     As a direct and proximate result of the conduct of the Defendants, Plaintiffs also have suffered special harm and continue to suffer special harm, including but not limited to the special harm of the emotional harm and stress of realizing that the money they worked so hard to save and invest for their entire adult lives, money that was intended to provide for a comfortable retirement, has been placed at risk and will likely not be recovered, as well as the special harm of the legal fees and expenses that they will be forced to incur for the purpose of investigating and seeking to recover that which should never have been placed at risk.

251.     Plaintiffs therefore are entitled to (1) actual damages, (2) special damages, (3) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable, and proper.

**FOR A NINTH CAUSE OF ACTION**
**(Breach of Contract – Defendants SCSOF II,**
**Point Farms Investors, ECW Investing, and WCM Main Street)**

252.     The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

253.     Each promissory note subject to this lawsuit is a valid and existing contract between Plaintiffs and these Defendants.

254.     Plaintiffs have fully performed all their obligations under the terms of each promissory note.

255.     These Defendants breached their contracts with Plaintiffs in one or more of the following ways, each of which constitutes a defined "Event of Default" under the notes:

a.     Executing, delivering, and failing to perform under the notes in violation of the South Carolina Unfair Trade Practices Act, as more fully described in the Sixth Cause of Action;

b.     Becoming unable to pay, or admitting in writing their inability to pay, their debts generally as they become due;

c.     Not paying interest within 30 days of its due date; and

d.     Such other particulars that discovery may reveal and the evidence in the case may demonstrate.

256.     Due to Defendants' default under the notes, Plaintiffs may accelerate, and hereby elect to accelerate, the repayment of their principal plus all unpaid interest, and are entitled to recover their attorneys' fees and costs.

257.     Plaintiffs therefore are entitled to (1) accelerate the payment of all sums due under the notes; (2) actual damages in the amount of the note principal and all unpaid interest accruing

under the notes, (3) attorneys' fees and costs, (4) prejudgment interest, and (5) such other relief as is just, equitable and proper.

### FOR A TENTH CAUSE OF ACTION
**(Breach of Contract Accompanied by a Fraudulent Act – Defendants SCSOF II, Point Farms Investors, ECW Investing, and WCM Main Street)**

258.    The paragraphs listed above are incorporated herein as if realleged and restated verbatim.

259.    As alleged in the preceding causes of action, Plaintiffs and Defendants, Inc. were parties to valid, binding, and enforceable contracts which Defendants breached. Plaintiffs expressly incorporate the allegations of the preceding causes of action into this paragraph.

260.    Defendants' breach of these contracts was accompanied by at least one fraudulent act as set forth in the Third Cause of Action.

261.    Defendants' fraudulent acts which resulted in the breach of the contracts were accompanied by a fraudulent intent as set forth in the Third Cause of Action.

262.    As a direct and proximate consequence of Defendants' wrongful conduct, Plaintiffs have incurred, and continue to incur, financial damages.

263.    Plaintiffs are therefore entitled to (1) actual and well managed account damages, (2) direct damages, (3) incidental damages, (4) consequential damages, (5) punitive damages, (6) such other relief as is just, equitable, and proper.

### FOR AN ELEVENTH CAUSE OF ACTION
**(Alter Ego/Single Business Enterprise/Piercing Corporate Veil/Joint Venture – Weir, WCM Global, Fund Defendants)**

264.    The paragraphs listed above are incorporated herein as if realleged and restated in full verbatim.

265.    Without conceding that any entity lacks separate existence for purposes of the civil conspiracy claim, Plaintiffs plead in the alternative the following facts supporting alter ego/single enterprise/veil-piercing/joint venture liability.

266.    Weir dominates and controls WCM Global, the Fund Defendants, and numerous other related entities, controlling their business decisions and actions to such an extent that they manifest no separate corporate interests and function solely to achieve the purposes of Weir. With regard to these entities, there has been such an amalgamation of corporate interests, entities, funds, and activities so as to blur the distinction between them and their activities to such an extent that they have no separate mind, will, or existence of their own.

267.    There has been such an amalgamation of corporate interests, funds, and activities among these entities that the distinctions between them are blurred, and they operate as mere instrumentalities of Weir.

268.    Weir has caused these entities to be grossly undercapitalized so that they are unable to meet their obligations in the course of their business, including their obligations to Plaintiffs.

269.    Weir has continually siphoned funds from them, commingled and transferred assets among the entities, and generally acted in a self-serving manner with regard to the property of the entities, such that the retention of separate corporate personalities would promote fraud, wrong or injustice, or would contravene public policy.

270.    Weir has commingled assets among these entities, siphoned funds for his personal benefit, and transferred money between entities without regard to corporate formalities, thereby disregarding the separate corporate existence of each entity.

271.    Weir exercised complete control and dominion over these entities and used that control to commit fraud and wrong, including:

a.    Misrepresenting the nature and security of investments;

b.    Concealing material risks and conflicts of interest;

c.    Diverting investor funds to self-serving projects and personal expenses; and

d.    Violating fiduciary duties owed to Plaintiffs.

260.    Weir's use of these entities to perpetrate fraud and breach legal duties has caused Plaintiffs substantial damages, including the loss of millions of dollars in principal, lost investment growth, and additional consequential damages.

261.    Retaining the corporate form under these circumstances would promote injustice and allow Weir to shield himself from liability for his wrongful acts.

262.    Plaintiffs therefore seek to pierce the corporate veil and hold Weir personally liable for all damages awarded under the claims in this Complaint, and for any other relief deemed just and proper.

263.    Plaintiffs therefore are entitled to full recovery from Weir and from any and all entities through which Weir is associated for any and all damages awarded under the numerous claims in the complaint and any other damages Plaintiffs have suffered.

WHEREFORE, having set forth their claims, Plaintiffs pray for judgment against Defendants jointly and severally as follows:

a.    For actual and well managed account damages and disgorgement of all fees and costs;

b.    For consequential damages;

c.    For return of Plaintiffs' principal;

d.    For treble damages pursuant to S.C. Code Ann. § 39-5-140;

e.     For reasonable attorneys' fees and costs of investigation and litigation pursuant to S.C. Code Ann. § 35-1-509, S.C. Code Ann. § 39-5-140, Md. Code Ann. § 13-408;

f.     For recission pursuant to S.C. Code Ann. § 35-1-509;

g.     For pre-judgment interest at the highest legal rate;

h.     For punitive damages;

i.     For an accounting; and

j.     For such other and further relief as is just, equitable, and proper.

Respectfully submitted,

**WILLOUGHBY HUMPHREY & D'ANTONI, P.A.**

*/s/ R. Walker Humphrey, II*
R. Walker Humphrey, II, Fed Bar No. 12524
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
Telephone Number: 843-619-4426
whumphrey@whdlawyers.com

Mitchell Willoughby, Fed Bar No. 4702
Hunter R. Pope, Fed Bar No. 13778
Post Office Box 8416
Columbia, South Carolina 29202
Telephone Number: 803-252-3300
mwilloughby@whdlawyers.com
hpope@whdlawyers.com

*Attorneys for Plaintiffs*

Charleston, South Carolina
December 31, 2025