IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Scott E. Smith, Eva Denise Smith, | ) | Case No. 6:25-cv-14047-JDA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Taverik Capital, LLC, *f/k/a WCM Global Wealth, LLC*; Magnolia Asset Services, LLC; Erik C. Weir; James A. Blair, III; SC Strategic Opportunity Fund II, LLC; Point Farm Investors, LLC; ECW Investing, LLC; Edisto River Investors, LLC; WCM Main Street, LLC; Reedy River Falls, LLC, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on a motion to stay the action and compel arbitration filed by Defendants Taverik Capital, LLC ("Taverik"); Magnolia Asset Services, LLC ("Magnolia"); Erik C. Weir; and James A. Blair, III (collectively, the "Arbitration Defendants") and a partial motion to dismiss filed by Defendants Taverik; Magnolia; ECW Investing, LLC ("ECW"); Reedy River Falls, LLC ("Reedy River"); and Weir (collectively, the "Dismissal Defendants"). [Docs. 24; 25.] For the reasons stated herein, the Court grants the motion to compel arbitration, stays the action, and denies with leave to refile the motion to dismiss.

## BACKGROUND

On or about August 2022, Plaintiffs sought prudent management of approximately $4 million in retirement savings. [Doc. 1 ¶¶ 63–64.] Weir and WCM Global Wealth, LLC ("WCM Global Wealth") presented themselves as expert wealth managers and fiduciaries

Judge Clarke scheduled a civil motion hearing September 1 at 10:00. Is anyone available to cover it?

to solicit Plaintiffs as clients.  [*Id.* ¶¶ 65–71.]  Weir and WCM Global Wealth managed two groups of Plaintiffs' assets: (1) a securities account custodied with Charles Schwab [*see* Doc. 24-2; *see also* Doc. 1 ¶ 187] and (2) a series of private debt and equity investments [*see* Doc. 1 ¶¶ 78, 151].

The former group of assets is governed by an Investment Advisory Agreement ("IAA") between Plaintiffs and WCM Global Wealth.  [Doc. 24-2.]  Among other provisions, the IAA contains the following arbitration agreement:

> **Arbitration.**  The parties waive their right to seek remedies in court, including any right to a jury trial.  **The parties agree that in the event of any dispute among the parties[] such dispute will be resolved exclusively by arbitration** to be conducted only in the county and state of the principal office of the Adviser at the time of such dispute in accordance with the rules of the Arbitration Association of America *("AAA")* applying the laws of the State of California or the State of South Carolina, as determined by the home state of the Client. Disputes will not be resolved in any other forum or venue.  The parties agree that such arbitration will be conducted by one or more persons who are experienced in dispute resolution regarding the securities industry, pre-arbitration discovery will be limited to the greatest extent provided by the rules of the AAA, the arbitration award will not include factual findings or conclusions of law, and no punitive damages will be awarded. The parties understand that any party's right to appeal or seek modification of rulings in an arbitration is severely limited.  Any award rendered by the arbitrator(s) will be final and binding and judgment may be entered upon it in any court of competent jurisdiction in the county and state of the principal office of the Adviser at the time such award is rendered.

[*Id.* ¶ 29 (some emphasis added).]

The latter group of assets is governed by individual promissory notes.  [Doc. 1 ¶¶ 78–79.]  Per Weir's recommendation, Plaintiffs loaned $1,500,000 to the following

2

debtor entities: SC Strategic Opportunity Fund II, LLC ("SCSOF II") ($350,000), Point Farm Investors, LLC ("Point Farm") ($400,000), Point Farm ($250,0000), ECW ($250,000), and WCM Main Street, LLC ("WCM Main Street") ($250,000). [*Id.* ¶¶ 78–79.] These debtor entities possessed overlapping interests and affiliations, undermining Plaintiffs' express desire for diversification.[1] [*See id.* ¶¶ 4, 73–74, 85, 88, 102, 105, 156, 193(j), 203(g), 245.] Plaintiffs also invested $600,000 into equity interests in two, non-defendant entities: WCM Camperdown, LLC ("Camperdown") ($500,000) and Crypto Venture I, LLC ("Crypto Venture") ($100,000). [*Id.* ¶ 151.]

Ultimately, the debtor entities could not pay their debts as they came due, and they breached their promissory notes. [See *id*. ¶¶ 78–172.] Specifically, SCSOF II disclosed in February 2025 that Plaintiffs would receive only $43,120 in accrued interest and $39,860.10 of their original $350,000 investment. [*Id.* ¶¶ 98–99.] Likewise, WCM Main Street admitted that noteholders would receive only 85% repayment of note balances. [*Id.* ¶ 110.] Point Farm and ECW have failed to pay interest when due and remain insolvent. [*Id.* ¶¶ 126, 129, 144, 147.] Camperdown repaid $50,335.85 of Plaintiffs' $500,000 investment, and Weir confirmed that no further payments would be made. [*Id.*

---

[1] Weir was WCM Global Wealth's sole managing member. [Doc. 1 ¶ 27.] WCM Global Wealth was SCSOF II's investment manager [*id.* ¶ 21], Reedy River was SCSOF II's managing member [*id.* ¶ 43], and Weir was Reedy River's sole managing member [*id.*]. Edisto River Investors, LLC ("Edisto River") was Point Farm's managing member, and Weir was Edisto River's sole managing member. [*Id.* ¶ 48.] Weir was ECW's sole managing member. [*Id.* ¶ 49.] Finally, Weir was WCM Main Street's president. [*Id.* ¶ 50.]

SCSOF II's primary asset was the CAP River campus in downtown Greenville. [*Id.* ¶¶ 87–89.] SCSOF II was also a partner in the Camperdown project in downtown Greenville. [*Id.* ¶¶ 88–89.] WCM Main Street was a 50/50 partner in these projects with SCSOF II. [*Id.* ¶ 88.] ECW funneled funds into SCSOF II and WCM Main Street. [*Id.* ¶¶ 136–40.]

¶ 162.]  Weir admitted that Plaintiffs "pretty much lost everything" in Crypto Venture.  [*Id.* ¶ 170 (internal quotation marks omitted).]

In response to concerns expressed by Plaintiffs, Weir ceased meaningful contact with Plaintiffs [*id.* ¶ 187] and "began changing entity names and operating through newly minted or rebranded LLCs—transitioning from WCM Global Wealth to [Taverik], and subsequently referencing yet a third company, [Magnolia]" [*id.* ¶ 185].  Plaintiffs allege that "these successor entities were used to evade responsibility, confuse clients and custodians, and obscure asset control and fee flows connected to Plaintiffs' investments." [*Id.* ¶ 186.]  Plaintiffs "delinked Weir from their Schwab accounts to protect their remaining securities."  [*Id.* ¶ 187.]

Due to Defendants' actions, Plaintiffs allegedly suffered "substantial financial damages, including lost principal and growth opportunity"; "fees, expenses, and out-of pocket costs associated with attempting to recover their assets"; and "emotional distress, anxiety, . . . loss of sleep, and . . . [continued work] beyond planned retirement due to the depletion and endangerment of their retirement savings."  [*Id.* ¶¶ 188–89.]

On December 31, 2025, Plaintiffs filed the present action against Defendants Taverik and Magnolia,[2] Weir, Blair, SCSOF II, Point Farm, ECW, Edisto River, WCM Main Street, and Reedy River.  [Doc. 1.]  Plaintiffs bring causes of action for (1) breach of fiduciary duty against Weir, Taverik, and Magnolia; (2) aiding and abetting breach of fiduciary duty against Blair; (3) fraud or constructive fraud against Weir, Taverik,

---

[2] "Weir split the business originally registered as WCM Global Wealth, LLC into two entities: (1) [Taverik], which is a continuation of the WCM Global Wealth corporate entity, and (2) [Magnolia].  Even though they are now separate entities, they together perform the functions previously performed by WCM Global Wealth, LLC, and under the same ownership as WCM Global Wealth, LLC."  [Doc. 1 ¶ 15.]

Magnolia, SCSOF II, Point Farm, ECW, Edisto River, WCM Main Street, and Reedy River; (4) violation of the South Carolina Uniform Securities Act of 2005, S.C. Code Ann. §§ 35-1-101–880, against all Defendants; (5) violation of the Maryland Securities Act, Md. Code Ann. § 11-101, *et seq.*, against Weir, Taverik, and Magnolia; (6) violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10–180, against Weir, Blair, Taverik, and Magnolia; (7) violation of the Maryland Consumer Protection Act, Md. Code Ann., Corps. & Ass'ns §§ 13-301, *et seq.*, against Weir, Blair, Taverik, and Magnolia; (8) civil conspiracy against all Defendants; (9) breach of contract against SCSOF II, Point Farm, ECW, and WCM Main Street; and (10) breach of contract accompanied by a fraudulent act against SCSOF II, Point Farm, ECW, and WCM Main Street. [*Id.* at 30–46 ¶¶ 191–263.[3]]   Further, Plaintiffs "seek to pierce the corporate veil and hold Weir personally liable for all damages awarded under the claims in the Complaint . . . ." [*Id.* ¶ 262.]  Plaintiffs request actual and well managed account damages and disgorgement of all fees and costs; consequential damages; return of Plaintiffs' principal; treble damages; reasonable attorneys' fees and costs; recission; pre-judgment interest at the highest legal rate; punitive damages; an accounting; and such other and further relief as is just, equitable, and proper.  [*Id.* at 48–49.]

On February 26, 2026, the Arbitration Defendants filed a motion to stay the action and compel arbitration pursuant to the Federal Arbitration Act ("FAA").[4]   [Doc. 24.]

---

[3] The paragraphs in the Complaint are misnumbered in that the four paragraphs after paragraph 271 are numbered 261, 262, 263, and 264.  Accordingly, there are two paragraphs for each of those four numbers.

[4] The Arbitration Defendants title their filing a "motion to dismiss or stay the action and compel arbitration," but they argue that a stay is the appropriate relief.  [Docs. 24 at 1; 24-1 at 9.] *See also Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds

Plaintiffs filed a response on March 26, 2026 [Doc. 35], and the Arbitration Defendants filed a reply on April 9, 2026 [Doc. 39]. Also on February 26, 2026, the Dismissal Defendants filed a motion to dismiss. [Doc. 25.] Plaintiffs filed a response on March 26, 2026 [Doc. 35], and the Dismissal Defendants filed a reply on April 9, 2026 [Doc. 38]. The motions are now ripe for review.

## APPLICABLE LAW

**Motions to Compel Arbitration**

The FAA establishes a "strong federal public policy in favor of enforcing arbitration agreements" and is designed to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 219 (1985). The FAA was enacted "in 1925 in order to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts." *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 639 (4th Cir. 2002) (internal quotation marks omitted). "Underlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002).

The FAA provides that arbitration clauses in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, a district court must compel arbitration and stay court proceedings if the parties have

---

that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

agreed to arbitrate their dispute. *Id*. §§ 2, 3. However, if the "making of the arbitration agreement or the failure, neglect, or refusal to perform the same" is at issue, a district court must first decide whether the arbitration clause is enforceable against the parties. *Id*. § 4. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983).

A party seeking to compel arbitration under the FAA must establish the following four elements: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration agreement purporting to cover the dispute; (3) the relationship of the transaction, as evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of a party to arbitrate the dispute.[5] *Am. Gen. Life & Accident Ins. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005). "[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Adkins*, 303 F.3d at 501 (internal quotation marks omitted).

"Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Id.* "Defendant, as the party seeking to enforce the Agreement, bears the initial burden of persuading this court that the parties entered into

---

[5] In deciding whether the parties have formed an agreement to arbitrate, the court must conduct a trial "when a party unequivocally denies that any arbitration agreement exists, and shows sufficient facts in support thereof." *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) (cleaned up). "To decide whether sufficient facts support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test" and "is entitled to consider materials other than the complaint and its supporting documents." *Id.* "If the record reveals a genuine dispute of material fact regarding the existence of an agreement to arbitrate, the court shall proceed summarily and conduct a trial on the motion to compel arbitration." *Id.* (cleaned up). In this context, "[a] factual dispute is material if the resolution thereof might affect the outcome of the motion under the governing law." *Id.* (cleaned up).

an enforceable arbitration agreement." *Gordon v. TBC Retail Grp., Inc.*, No. 2:14-cv-03365-DCN, 2016 WL 4247738, at *5 (D.S.C. Aug. 11, 2016) (internal quotation marks omitted). "If defendant makes such a showing, then the burden shifts to the [plaintiff] to show that even though there was some written contract, [the plaintiff] did not actually agree to it—because [his] signature was forged, the terms of the contract were misrepresented, or some other reason evincing lack of true agreement." *Id.* (alterations in original) (internal quotation marks omitted). Where a valid arbitration agreement exists and covers the claims at issue, this Court has "no choice but to grant a motion to compel arbitration." *Adkins*, 303 F.3d at 500.

**Motions to Dismiss**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the [petition] in a light most favorable to the [petitioner]." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the [petition's] allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985).

With respect to well-pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the [respondent] fair notice of what the . . . claim is and the grounds upon which it rests." While a [petition] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [petitioner's] obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the [petition] are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more ... than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the [petitioner] pleads factual content that allows the court to draw the reasonable inference that the [respondent] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability. *Twombly*, 550 U.S. at 557; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that

9

are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Accordingly, the plausibility standard requires a petitioner to articulate facts that, when accepted as true, demonstrate that the petitioner has stated a claim that makes it plausible the petitioner is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## **DISCUSSION**

**The Motion to Compel Arbitration**

The Arbitration Defendants contend that the IAA's arbitration agreement should be broadly construed to encompass Plaintiffs' claims regarding the above-described private debt and equity investments because they were sold within the investment advisory relationship between Plaintiffs and WCM Global Wealth. [Doc. 24-1 at 3–7; *see id.* at 6–7 ("[T]o the extent Plaintiffs seek to rely on the investment advisory relationship established by and through the IAA and the duties arising therefrom to establish their broad swath of claims . . ., Plaintiffs must also abide by the terms of the IAA [governing] that relationship.").] Moreover, the Arbitration Defendants argue that, although the IAA is between Plaintiffs and WCM Global Wealth, the arbitration agreement equally applies to them because Plaintiffs "seek to plead intertwined and interdependent theories against the [Arbitration] Defendants[,] including theories of veil piercing and agency . . . ." [*Id.* at 9.]

Plaintiffs contend that the arbitration agreement is void against public policy because WCM Global Wealth and Weir are not registered as investment advisors in Maryland. [Doc. 35 at 9–12.] The Arbitration Defendants counter that they are not

required to register in Maryland, and their failure to do so does not invalidate the IAA's arbitration agreement.  [Doc. 39 at 2–5.]  Alternatively, Plaintiffs argue that the arbitration agreement does not apply to disputes concerning Plaintiffs' private debt and equity investments because the IAA governs only "adviser-supervised activity" in a specific account custodied with Charles Schwab.  [Doc. 35 at 14.]  Finally, Plaintiffs contend that the Arbitration Defendants have failed to comply with Local Civil Rule 7.02.  [*Id.* at 16–17.]

### *Whether the IAA Requires Arbitration Under the FAA*

The parties do not appear to dispute three of the four requirements for arbitration under the FAA.  [*See generally* Docs. 24-1; 35; 39.]  Regarding the first element, a dispute exists between the parties as demonstrated by the allegations in the Complaint.  [Doc. 1.]  Regarding the third element, the transaction(s) at issue appear to implicate interstate commerce.[6]  Regarding the fourth element, Plaintiffs have refused to arbitrate this action

---

[6] "The United States Supreme Court has held that the phrase 'involving commerce' is the same as 'affecting commerce,' which has been broadly interpreted to mean that Congress intended to utilize its powers to regulate interstate commerce to its full extent."  *Blanton v. Stathos*, 570 S.E.2d 565, 568 (S.C. Ct. App. 2002) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995)).  "To ascertain whether a transaction involves commerce within the meaning of the FAA, the court must examine the agreement, the complaint, and the surrounding facts."  *Zabinski v. Bright Acres Assocs.,* 553 S.E.2d 110, 117 (S.C. 2011).

That said, "the FAA does not impose a burden upon the party invoking the FAA to put forth specific evidence proving the interstate nature of the transaction."  *Rota-McLarty v. Santander Consumer USA, Inc.,* 700 F.3d 690, 697 (4th Cir. 2012); *see McCumbee v. M. Pizza, Inc.,* No. 3:22-cv-128, 2023 WL 2725991, at *13 (N.D.W. Va. Mar. 30, 2023) ("[T]he Fourth Circuit does not require parties to affirmatively demonstrate that [the interstate commerce] element has been met."); *Ghouri v. AmSher Collection Servs.,* No. 1:22-cv-00503 (RDA/JFA), 2022 WL 11964565, at *5 (E.D. Va. Oct. 19, 2022) (same).  In any event, an investment advisory agreement between entities residing in different states implicates interstate commerce.  *See Benezra v. Zacks Inv. Rsch., Inc.*,

as demonstrated by this lawsuit and Plaintiffs' opposition to the Arbitration Defendants' motion to compel arbitration.  [Docs. 1; 24.]

Regarding the second element, the parties disagree as to whether the IAA's arbitration agreement purports to cover the present dispute**.**  A scope question arises "when the parties have a contract that provides for arbitration of some issues" and it is unclear whether a specific dispute falls within that contract.  *First Options of Chicago v. Kaplan*, 514 U.S. 938, 945 (1995).  As stated previously, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."[7]  *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25.

The IAA's arbitration agreement states, in relevant part: "The parties agree that in the event of *any dispute among the parties*[] such dispute will be resolved exclusively by arbitration . . . ."  [Doc. 24-2 ¶ 29 (emphasis added).]  Plaintiffs and the Arbitration Defendants both appear to assume that the suit must arise out of or relate to the IAA to fall within the scope of the arbitration agreement.  [*See* Docs. 24-1 at 4–5, 6–7; 35 at 2, 12–16.]  However, the arbitration agreement at issue contains no such "arising out of or relating to" language; in fact, the language is broader still, purporting to govern "any

---

No. 1:11-cv-596, 2012 WL 1067559, at *3 n.1 (M.D.N.C. Mar. 30, 2012) ("The parties reside in different states, and the transactions related to the [investment advisory agreement] were conducted across state lines through interstate commerce.").

[7] Regarding the issue of scope, Plaintiffs argue that "[the] thumb on the scale of arbitration is gone," citing the Supreme Court's recent ruling in *Morgan v. Sundance*, 596 U.S. 411 (2022).  [Doc. 35 at 9; *see also id.* at 15 n.3.]  However, *Morgan*'s holding is narrower than Plaintiffs suggest.  *Morgan* concerned the waiver of arbitration rights: a procedural rule regarding litigation conduct.  To this end, the *Morgan* Court held that "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring *procedural rules*."  *Morgan*, 596 U.S. at 418 (emphasis added).  The *Morgan* Court did *not* address the *Moses* presumption, which concerns the *scope* of arbitrable issues.  *See* Tamar Meshel, *In Defense of Moses*, 96 St. John's L. Rev. 395, 402 n.30 (2022).

dispute" between the parties without any attendant limitations.  [Doc. 24-2 ¶ 29.]  Courts interpret similar arbitration agreements to their broadest extent, even where the contract itself is narrow in scope.  *See, e.g., Levin v. Alms and Assocs., Inc.,* 634 F.3d 260, 267 (4th Cir. 2011) (concluding that an arbitration agreement subjecting "'[a]ny dispute'" to binding arbitration was "broad enough to encompass *all* agreements and *any* disputes, past and present"); *Sanchez v. Nitro-Lift Techs., LLC*, 762 F.3d 1139, 1146–48 (10th Cir. 2014) (concluding that a wage-dispute claim was subject to arbitration where a contract between the parties discussed "only issues related to competition, confidentiality, and retention of corporate documents" but nevertheless contained a broad arbitration agreement purporting to cover "'*[a]ny dispute, difference or unresolved question*'" between the disputing parties), *id.* at 1147 ("In our view, when the broad arbitration clause is considered together with the entire language of the narrow contract, two reasonable constructions emerge—either the parties agreed to arbitrate all disputes arising between them, or they agreed to arbitrate all disputes concerning only those issues covered in the agreement.  We need not decide this difficult question, for we have stated that 'to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved *in favor* of arbitrability.'" (quoting *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 798 (10th Cir. 1995)); *Nat'l Am. Ins. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1291 (10th Cir. 2004) (disagreeing with the plaintiffs' argument that the arbitration clause covered only disputes coinciding with the subject matter of the contract, where the arbitration agreement "require[d] that 'any irreconcilable dispute' be arbitrated, without any limiting language").  Here, the Court concludes that the IAA's arbitration agreement

13

covers "any dispute" between Plaintiffs and WCM Global Wealth, even disputes that do not bear a direct relationship to the precise subject-matter of the contract.[8]

As previously stated, the IAA is between Plaintiffs and WCM Global Wealth. [*See* Doc. 24-2 at 11.]  However, the Arbitration Defendants—Taverik, Magnolia, Weir, and Blair—are nevertheless entitled to enforce the arbitration agreement as nonsignatories. State law applies to determine whether a nonsignatory can enforce an arbitration agreement.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631–32 (2009).  In South Carolina,[9] "[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Pearson v. Hilton Head Hosp.*, 733 S.E.2d 597, 600 (S.C. Ct. App. 2012) (internal quotation marks omitted).  "South Carolina has recognized several theories that could bind nonsignatories to arbitration agreements under general principles of contract and agency law, including (1) incorporation by reference, (2) assumption,

---

[8] Even so, the present dispute appears to relate to the IAA.  For example, Plaintiffs allege that Weir was a purported "financial advisor" and that the private investments at issue were made "through Weir and WCM Global Wealth."  [Doc. 1 ¶¶ 1, 16.]  In addition, Plaintiffs allege that Weir and WCM Global Wealth "made representations to Plaintiffs that were false and/or misleading," including "[r]epresenting that [they were] properly registered to provide investment advisory services."  [*Id.* ¶ 203(i); *see also id.* ¶ 217(l).] Further, Plaintiffs allege that Defendants' conduct caused Plaintiffs to "delink[] Weir from their Schwab accounts [*i.e.,* the accounts governed by the IAA] to protect their remaining securities."  [*Id.* ¶ 187.]  These allegations reference the parties' investment advisory relationship governed by the IAA.  *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/relate (last accessed July 31, 2026) (defining "relate" as "to have relationship or connection").

[9] The Court applies South Carolina law here.  [*See* Doc. 24-2 at 9 ¶ 24 ("To the extent not inconsistent with applicable federal law, this Agreement shall be construed in accordance with and governed by the laws of the State of South Carolina applicable to contracts entered into and wholly to be performed in the State of South Carolina by South Carolina residents.").]

14

(3) agency, (4) veil piercing/alter ego, and (5) estoppel." *Wilson v. Willis*, 827 S.E.2d 167, 174 (S.C. 2019).

"Weir split the business originally registered as WCM Global Wealth, LLC into two entities: (1) [Taverik], which is a continuation of the WCM Global Wealth corporate entity, and (2) [Magnolia]." [Doc. 1 ¶ 15.] Weir was the president, CEO, and sole managing member of WCM Global Wealth. [*Id.* ¶ 27; Doc. 24-2 at 22–23.] Blair was general counsel for WCM Global Wealth and now serves as general counsel for Magnolia. [Doc. 1 ¶¶ 25, 40.] Moreover, Plaintiffs allege that each of the Arbitration Defendants and WCM Global Wealth engaged in coordinated efforts to injure Plaintiffs, invoking theories of agency and veil piercing. [*See, e.g., id.* ¶¶ 52–54; *id.* at 46–48.] Due to these "allegations of . . . substantially interdependent and concerted misconduct," the Arbitration Defendants may enforce the arbitration agreement as successors and/or agents of WCM Global Wealth. *Brantley v. Republic Mortg. Ins.*, 424 F.3d 392, 396 (4th Cir. 2005) (internal quotation marks omitted); *see S.C. Pub. Serv. Auth. v. Great W. Coal (Ky.), Inc.*, 437 S.E.2d 22, 24 (S.C. 1993) (concluding that the president of a company was entitled to demand arbitration even though he did not sign the contract in his individual capacity), *id.* ("[W]hen the nonsignatory parties are willing to submit to arbitration, the case should be arbitrated."); *McPheely v. Adams*, No. 6:13-cv-02660-GRA, 2013 WL 6581850, at *7 (D.S.C. Dec. 16, 2013) ("[The defendants] are former and current . . . directors and outside counsel. Because the claims against [the defendants] stem from their actions taken as

15

directors, officers, or agents . . ., [the defendants] may invoke the arbitration provision . . . to compel [the plaintiffs] to arbitrate.").[10]

In sum, the Court concludes that the IAA's arbitration agreement purports to cover the dispute within the meaning of the FAA because it constitutes a "dispute among the parties." [Doc. 24-2 ¶ 29.] The Court now turns to whether any contract defenses render the arbitration agreement unenforceable.

### Whether the Arbitration Agreement Is Unenforceable

As previously noted, if a defendant persuades a court that the parties entered into an enforceable arbitration agreement, "then the burden shifts to the [plaintiff] to show that even though there was some written contract, [the plaintiff] did not actually agree to it—because [his] signature was forged, the terms of the contract were misrepresented, or some other reason evincing lack of true agreement." *Gordon,* 2016 WL 4247738, at *5 (alterations in original) (internal quotation marks omitted).

Plaintiffs argue that the Court should not enforce the arbitration agreement because the IAA violates public policy. [Doc. 35 at 9–12.] Specifically, Plaintiffs contend that the IAA is void *ab initio* because Weir and WCM Global Wealth failed to comply with Maryland's registration requirement.[11] [*Id.* at 11.] However, that is an issue for the

---

[10] Further, Plaintiffs have not responded to the Arbitration Defendants' arguments regarding whether nonsignatories can enforce the arbitration agreement. [*See generally* Doc. 35]; *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (citations omitted)).

[11] The Maryland Securities Act, Md. Code Ann., Corps. & Ass'ns § 11-401(b), makes it unlawful for any person to act as an investment adviser in Maryland unless registered or exempt. The Act states, in relevant part:

arbitrator, not the Court, to decide.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) ("First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.  Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. . . .  [W]e conclude that because respondents challenge the [entire contract on illegality grounds], but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court."); *Snowden*,

---

(b)     A person may not transact business in this State as an investment adviser or as an investment adviser representative unless:

(1)     The person is registered as an investment adviser or an investment adviser representative under this subtitle;

(2)     The person's only clients in this State are investment companies as defined in the Investment Company Act of 1940, or insurance companies; or

(3)     The person has no place of business in this State, and:

. . .

(ii)     During the preceding 12–month period, the person has had no more than five clients who:

1.   Are residents of the State . . . .

Md. Code Ann., Corps. & Ass'ns § 11-401(b); *see also id.* § 11-101(i)(1) (defining "investment advisor" as any person who, for compensation, advises others on the value of or advisability of investing in securities; provides financial and investment counseling, analyzes financial information, and recommends a financial plan; or holds out as a financial or investment planner, counselor, or consultant).

290 F.3d at 636 ("The law is well settled in this circuit that, if a party seeks to avoid arbitration and/or a stay of federal court proceedings pending the outcome of arbitration by challenging the validity or enforceability of an arbitration provision on any grounds that exist at law or in equity for the revocation of any contract, the grounds must relate specifically to the arbitration clause and not just to the contract as a whole." (cleaned up)), 637 ("Here, [the plaintiff's] allegations of . . . non-licensure do not relate specifically to the [a]rbitration [a]greement.  Neither do they underlie a claim that [the plaintiff] failed to assent to the terms of the [a]greement.  Therefore, they cannot serve as a basis to uphold the district court's denial of [the motion to compel arbitration]."); *Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 490–93 (6th Cir. 2011) (holding that the plaintiffs could not avoid arbitration where (1) the plaintiffs' claims concerned the substance of the loan agreements rather than their failure to assent to such agreements and (2) drawing a distinction between entering into a loan agreement with an unlicensed lender and not assenting to the loan agreement at all).  Accordingly, the undersigned does not address Plaintiffs' arguments concerning non-compliance with the Maryland Securities Act.

### *Whether the Court Should Deny the Motion for Failure to Consult Under Local Civil Rule 7.02*

Finally, Plaintiffs argue that the Court should deny the Arbitration Defendants' motion because they did not include "an affirmation by the movant's counsel that prior to filing the motion he or she conferred or attempted to confer with opposing counsel and attempted in good faith to resolve the matter contained in the motion" in accordance with Local Civil Rule 7.02, D.S.C.  [*See* Doc. 35 at 16–17.]  In response, the Arbitration Defendants state that "the nature and implications of a [m]otion to [c]ompel [a]rbitration strongly imply that such a motion falls within the exemptions to the meet[-]and[-]confer

18

obligation." [Doc. 39 at 8.] The Court agrees. A motion to compel arbitration closely parallels a motion to dismiss and likely qualifies as an "[o]ther similar dispositive motion[]" excluded from the meet-and-confer obligation. Local Civ. R. 7.02(D) (D.S.C.).

Further, given the Court's discretion to enforce local rules, *see Francisco v. Verizon S., Inc.,* 272 F.R.D. 436, 440 (E.D. Va. 2011) ("As a general rule, enforcement of local rules is within the sound discretion of the Court."), and the FAA's "strong federal public policy in favor of enforcing arbitration agreements," *Dean Witter Reynolds, Inc.*, 470 U.S. at 217, the Court would not deny the Arbitration Defendants' motion to compel arbitration even if motions to compel arbitration were not exempt from Local Rule 7.02's meet-and-confer obligation. *Cf. Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan,* No. 1:17-02729-ELH, 2019 WL 4879015, at *4 (D. Md. Oct. 3, 2019) ("Failure to comply with Local Rule 104.8 [providing that counsel for the parties must confer and attempt to resolve their discovery dispute before the court will consider the motion] does not *per se* require dismissal of a party's motion to compel.").

**The Motion to Dismiss**

Because Plaintiffs' Complaint raises allegations of conspiracy and substantially intertwined conduct among all Defendants, the Court stays the case and, therefore, defers ruling on the Dismissal Defendants' motion to dismiss pending arbitration. *See Cook v. John Hancock Life Ins. (U.S.A.),* No. 7:12-CV-00455, 2013 WL 942384, at *1 n.2 (W.D. Va. Mar. 11, 2013), *as corrected* (Mar. 13, 2013) ("In light of the Court's ruling that a stay is appropriate at this time, the Court concludes that the appropriate course is to deny [two pending motions to dismiss] without prejudice to any party's ability to reassert them, rather than leaving the motions pending on the Court's docket for an extended period of time.");

19

*Robertson's Ready Mix, Ltd. v. Edwards,* No. EDCV 22-1386 JGB (SPx), 2023 WL 3049228, at *7 (C.D. Cal. Mar. 2, 2023) (deferring ruling on a motion to dismiss under Rule 12(b)(6) pending the outcome of arbitration proceedings as to some defendants because the plaintiffs alleged conspiracy between defendants).  Accordingly, the Court denies the motion without prejudice and with leave to refile.

### CONCLUSION

For the foregoing reasons, The Arbitration Defendants' motion to stay the action and compel arbitration [Doc. 24] is GRANTED.  This action is accordingly STAYED pending arbitration.  The Court directs Plaintiffs and the Arbitration Defendants to file joint status reports updating the Court as to the status of their arbitration beginning November 4, 2026, and every ninety (90) days thereafter or within ten (10) days of the completion of their arbitration.

In addition, the Dismissal Defendants' motion to dismiss [Doc. 25] is DENIED without prejudice and with leave to refile pending the outcome of arbitration proceedings.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

August 6, 2026
Greenville, South Carolina